IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| AEDAN BUSH KANE,<br>Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil No. 3:18cv746 (HEH) |
| | ) | |
| ANDREW M. SAUL,[1] | ) | |
| Commissioner of Social Security,<br>Defendant. | ) | |
| | ) | |

_____

### REPORT AND RECOMMENDATION

On August 31, 2014, Aedan Kane ("Plaintiff") applied for Social Security Disability

Benefits ("DIB") under the Social Security Act ("Act"), alleging disability from

avoidant/restrictive food intake disorder ("ARFID"), simple partial seizures, depression, anxiety

and back pain, with an alleged onset date of January 3, 2014.  The Social Security

Administration ("SSA") denied Plaintiff's claim both initially and upon reconsideration.

Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claim in a written decision

and the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as

the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred in:  (1) assigning less-than-controlling weight to the opinions of

Plaintiff's treating psychologist, Kevin B. Handley, Ph.D., and Plaintiff's post-hearing

---

[1]      On June 4, 2019, the United States Senate confirmed Andrew M. Saul to a six-year term as the Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Saul should be substituted for former Acting Commissioner Nancy A. Berryhill as the defendant in this matter.

consultative psychologist, Therese M. May, Ph.D.; (2) posing a hypothetical to the vocational

expert ("VE") that did not adequately account for Plaintiff's impairments; and, (3) posing a

hypothetical to the VE that conflicted with the *Dictionary of Occupational Titles* ("DOT").

(Mem. in Support of Pl.'s Mot. For Summ. J. ("Pl.'s Mem.") (ECF No. 10) at 7-13.)  This matter

now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter ripe for

review.[2]  For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary

Judgment (ECF No. 9) be GRANTED, that Defendant's Motion for Summary Judgment (ECF

No. 13) be DENIED and that the final decision of the Commissioner be VACATED and

REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## I.     PROCEDURAL HISTORY

On August 31, 2014, Plaintiff filed an application for DIB, with an alleged onset date of

January 3, 2014. (R. at 94.)  The SSA denied this claim initially on March 17, 2015, and again

upon reconsideration on July 14, 2015. (R. at 104, 115.)  At Plaintiff's written request, the ALJ

held a hearing on May 23, 2017. (R. at 36-75, 125-26.)  On September 28, 2017, the ALJ issued

a written opinion, denying Plaintiff's claim and concluding that Plaintiff did not qualify as

disabled under the Act, because Plaintiff could perform jobs existing in significant numbers in

the national economy. (R. at 10-21.)  On September 5, 2018, the Appeals Council denied

Plaintiff's request for review, rendering the ALJ's decision as the final decision of the

---

[2]      The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc.
R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of
birth (except for year of birth), and any financial account numbers from its consideration of
Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to
only the extent necessary to properly analyze the case.

Commissioner subject to review by this Court. (R. at 1-6.)

## II.  STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the

Social Security Administration's disability determination 'when an ALJ has applied correct legal

standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v.*

*Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d

337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a

preponderance and includes the kind of relevant evidence that a reasonable mind could accept as

adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig*

*v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  Indeed, "the substantial evidence standard

'presupposes . . . a zone of choice within which the decision makers can go either way, without

interference by the courts.  An administrative decision is not subject to reversal merely because

substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F.

App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir.

1988)).

To determine whether substantial evidence exists, the court must examine the record as a

whole, but may not "undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472

(quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)); *see also Biestek v. Berryhill*,

139 S. Ct. 1148, 1157 (2019) (holding that the substantial-evidence inquiry requires case-by-case

consideration, with deference to the presiding ALJ's credibility determinations).  In considering

the decision of the Commissioner based on the record, the court must "take into account

whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002,

1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite her physical and mental limitations. § 404.1545(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

### III. THE ALJ'S DECISION

On May 23, 2017, the ALJ held a hearing during which Plaintiff (unrepresented by counsel), his mother and a VE testified. (R. at 36-75.) On September 28, 2017, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 10-21.)

The ALJ followed the five-step evaluation process established by the Social Security Act

4

in reaching her conclusion. (R. at 11-21.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. (R. at 13.) At step two, the ALJ found that Plaintiff had the following severe impairments: depression, anxiety disorder, obsessive compulsive disorder ("OCD"), ARFID,[3] personality disorder with avoidant personality traits, seizure disorder, lumbago and sciatica. (R. at 13.) At step three, the ALJ concluded that Plaintiff did not suffer from an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-15.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform light work with additional limitations. (R. at 15.) Specifically, Plaintiff required the option to alternate between sitting and standing in place every half-hour. (R. at 15.) He could occasionally climb ramps and stairs, but he could never climb ladders, ropes or scaffolds. (R. at 15.) Plaintiff could occasionally balance, stoop, kneel, crouch or crawl. (R. at 15.) He could not handle exposure to hazards, temperature extremes (both hot and cold), humidity and wetness. (R. at 15.) Finally, the ALJ found that Plaintiff could perform unskilled work with a specific vocational preparation ("SVP") level of no more than two in a non-production-oriented work setting, with no interaction with the public and no more than occasional interaction with co-workers and supervisors. (R. at 15.)

At step four, the ALJ determined that Plaintiff could not perform any past relevant work.

---

[3]     "The ARFID diagnosis describes individuals whose symptoms do not match the criteria for traditional eating disorder diagnoses, but who, nonetheless, experience clinically significant struggles with eating food." Avoidant/Restrictive Food Intake Disorder (ARFID), Ctr. for Eating Disorders (Aug. 12, 2019), https://eatingdisorder.org/eating-disorder-information/avoidantrestrictive-food-intake-disorder-arfid/. Patients with ARFID often do not consume enough calories or nutrients through their diet. Id.

(R. at 19.) However, at step five, the ALJ found that Plaintiff could perform jobs existing in significant numbers in the national economy, including mail clerk, general office helper and router. (R. at 20.) Accordingly, the ALJ concluded that, during the relevant period, Plaintiff did not qualify as disabled under the Act. (R. at 20-21.)

## IV.    ANALYSIS

Plaintiff, age twenty-nine at the time of this Report and Recommendation, previously worked in sales. (R. at 248.) He applied for Social Security Benefits, alleging disability from ARFID, simple partial seizures, depression, anxiety and back pain, with an onset date of January 3, 2014. (R. at 94.) Plaintiff's appeal to this Court alleges that the ALJ erred by: (1) assigning less-than-controlling weight to the opinions of Dr. Handley and Dr. May; (2) posing a hypothetical to the VE that did not adequately account for Plaintiff's impairments; and, (3) posing a hypothetical to the VE that conflicted with the DOT. (Pl.'s Mem. at 7-14.) For the reasons set forth below, the ALJ erred in her decision.

### A.    Substantial Evidence Supports the ALJ's Assignment of Weight to the Opinions of Drs. Handley and May.

Plaintiff argues that the ALJ erred in assigning significant — but not great — weight to the opinions of examining psychologists Drs. Handley and May. (Pl.'s Mem. at 7-11.) Specifically, Plaintiff argues that the opinions of these two psychologists warranted controlling weight, because the psychologists provided medical support for their opinions and other medical evidence in the record comported with their opinions. (Pl.'s Mem. at 9.) Defendant responds that the ALJ appropriately assigned weight to each medical source. (Def.'s Mot. for Summ. J. & Br. in Supp. ("Def.'s Mem.") (ECF No. 13) at 17-20.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would

6

significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ

must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluations that have been ordered.

20 C.F.R. §§ 404.1512, 404.1527. When the record contains a number of different medical

opinions, including those from Plaintiff's treating sources, consultative examiners or other

sources that are consistent with each other, then the ALJ makes a determination based on that

evidence. § 404.1527(c). If, however, the medical opinions are inconsistent internally with each

other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to

properly analyze the evidence involved. § 404.1527(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating

source that offers an opinion entitled to controlling weight. SSR 06-3p.[4] Acceptable medical

sources include licensed physicians, licensed or certified psychologists and certain other

specialists, depending on the claimed disability. § 404.1513(a), 404.1527(a). The regulations

also provide for the consideration of opinions from "other sources," including nurse-

practitioners, physician's assistants or therapists. SSR 06-03p; § 404.1527(f).[5] Under the

applicable regulations and case law, a treating source's opinion must be given controlling weight

---

[4]     Effective March 27, 2017, the SSA rescinded SSR 96-2p and 06-3p, instead incorporating some of the Rulings' policies into 20 C.F.R. § 404.1527(f). 82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). Plaintiff filed his claim on August 31, 2014, before this regulation took effect. (R. at 94.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claim.

[5]     The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. § 404.1527(f). The given examples constitute a non-exhaustive list. SSR 06-03p.

if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  § 404.1527(c)(2); *Lewis v. Berryhill*, 858 F. 3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p.  Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, such as when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported.  § 404.1527(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'"  *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)).  Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded.  *Id.*

The ALJ must consider the following when evaluating a treating source's opinion:  (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors.  § 404.1527(c).  However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act.  § 404.1527(d)(1).  Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources."  SSR 06-03p.

### 1.    Dr. Handley's Opinion

Dr. Handley started treating Plaintiff when he was between the ages of sixteen and eighteen.[6]  (R. at 65.)  On February 1, 2017, Dr. Handley wrote a letter opining that "the rapid onset of chronic back pain and a seizure disorder" exacerbated Plaintiff's anxiety, depression and OCD, resulting in "perpetual maladjustment and distress that . . . rendered [Plaintiff] incapable of normal functioning in most social and employment settings." (R. at 481.)  He also opined that Plaintiff had significant motivational deficits due to his depression, which his mood, chronic pain and fear of seizures exacerbated, as well as short-term memory problems resulting from Depakote[7] and depression.  (R. at 481.)  Dr. Handley further remarked that Plaintiff's OCD caused him great fear of contamination, which caused "significant avoidance behaviors that prevent functioning in any environment that Plaintiff could not consider free from contamination." (R. at 481.)  He also noted that Plaintiff suffered from ARFID.  (R. at 481.)

Dr. Handley opined that Plaintiff's anxiety, mood and eating disorder "severely impacted" his social functioning and activities of daily living.  (R. at 481.)  He wrote that Plaintiff could not financially support or prepare food for himself, depending on his parents for his needs.  (R. at 481.)  Additionally, Dr. Handley remarked that Plaintiff could maintain his personal hygiene, but that Plaintiff's eating disorder, seizures and back pain reduced his ability to maintain his health.  (R. at 481.)  Dr. Handley described Plaintiff's life as "mostly solitary." (R. at 481.)  Dr. Handley also opined that Plaintiff's diagnoses impacted his work capacity, and his

---

[6]    During his hearing before the ALJ, Plaintiff explained that Dr. Handley "doesn't really keep records in the traditional form." (R. at 65.)  Indeed, the record includes no specific dates for when Dr. Handley started treating Plaintiff.

[7]    Depakote's primary ingredient, divalproex sodium, is used to treat manic episodes associated with bipolar disorder and epileptic seizures. *Depakote, Divalproex Sodium*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

depression and pain "completely prevent[ed] him from working." (R. at 481.)

With respect to treatment, Dr. Handley noted that cognitive, behavioral and acceptance-based therapies minimally affected Plaintiff's OCD and eating disorder, but that Plaintiff had not displayed much progress. (R. at 482.) Dr. Handley also wrote that Plaintiff's fear of oral ingestion prevented him from consistently taking medication that would help mitigate his illnesses. (R. at 482.)

Dr. Handley remarked that Plaintiff appeared alert and oriented, did not show "any other indicators of gross neuropsychological deficits" besides his short-term memory problem, had above-average intellectual abilities, demonstrated no abnormal motor movements and could understand abstract concepts. (R. at 482.) He also observed that Plaintiff had goal-oriented and coherent speech with a normal rhythm, rate and volume; made appropriate eye contact; exhibited good social skills; dressed appropriately; and, had a restricted affect with a congruent and responsive mood. (R. at 482.) He commented that Plaintiff's depression, poor nutrition and other diagnoses likely caused "cognitive sluggishness" and impacted his attention and concentration. (R. at 482.)

Ultimately, Dr. Handley concluded that Plaintiff should qualify for disability due to his severe symptoms and functional deficits that probably would not substantially improve. (R. at 482.) He opined that Plaintiff would be unable to complete tasks that interfered with his OCD and ARFID-related symptoms, would require "excessive accommodations" at work and would find it nearly impossible to interact with co-workers and the public. (R. at 482.)

The ALJ assigned significant — but not great — weight to Dr. Handley's opinion based on inconsistencies between his description of Plaintiff's activities and functioning and the evidence in the record. (R. at 18.) Specifically, the ALJ noted that Dr. Handley's opinion did

not align with Plaintiff's testimony that he helped with laundry twice per week, took out the trash once per week, went outside daily, drove once per week to doctor appointments and engaged in daily hobbies, including reading, painting, playing guitar and using the internet. (R. at 18.) The ALJ also remarked that "mental impairments at a level of severity opined by Dr. Handley would be more apparent to other medical providers"; yet, Plaintiff's medical providers consistently noted Plaintiff's normal mood and affect. (R. at 18.) The Court finds the ALJ's explanation for the weight afforded to Dr. Hadley's opinion legally sufficient. Moreover, substantial evidence, including Plaintiff's medical records and testimony, supports the ALJ's assignment of weight.

On February 21, 2014, Plaintiff presented to Fredericksburg Orthopaedic Associates, complaining of back and neck pain. (R. at 333-34.) Although Plaintiff displayed a flat affect, the physician's assistant described him as "very pleasant." (R. at 334.) On March 12, 2014, Plaintiff presented to Susan Holland, M.D., complaining of muscle spasms. (R. at 349.) Plaintiff told Dr. Holland that he experienced three or four fifteen- or twenty-second episodes where he remembered a memory that was not his, felt as though he was in "a dream but was awake," lost his sense of time and location, and experienced dread. (R. at 349.) Notably, Plaintiff did not lose consciousness or his ability to communicate during the episodes. (R. at 349.) On examination, Plaintiff appeared alert, oriented and in no acute distress. (R. at 349.) Dr. Holland assessed that Plaintiff had an "[a]lteration of consciousness" and an eating disorder, and she referred him to a neurologist. (R. at 349.) Plaintiff returned to Dr. Holland's practice on April 15, 2014, complaining of chest pain. (R. at 347.) Lauren Scott, N.P., also described Plaintiff as alert, oriented and in no acute distress. (R. at 347.)

Plaintiff visited Rappahannock Neurology Specialists five times between May and November 2014. (R. at 370-80.) On May 12, 2014, Plaintiff complained that during the three

months before his appointment, he experienced five or six twenty- to thirty-second episodes of sudden déjà vu, after which he needed twenty to thirty minutes to recover.  (R. at 373.)  He did not lose consciousness or convulse during these episodes.  (R. at 373.)  Amandeep Sangha, M.D., wrote that Plaintiff had a transient alteration of awareness and scheduled an electroencephalogram[8] ("EEG") and a magnetic resonance imaging ("MRI") of Plaintiff's brain.  (R. at 374).  Dr. Sangha remarked that he "suspect[ed] partial complex seizures" or "[a]n underlying anxiety/panic state[,]" but noted that Plaintiff had not reported any stress.  (R. at 374.)

Plaintiff underwent the EEG on May 21, 2014, (R. at 376-77, 380), and the MRI on May 22, 2014, (R. at 378-79).  The EEG returned normal results with no lateralizing[9] or epileptiform[10] features.  (R. at 377.)  The MRI also produced normal results.  (R. at 378.)  During physical examinations conducted by neurologists in July and November 2014, Plaintiff appeared in no acute distress and looked well-appearing and well-nourished.  (R. at 371, 412.)  He also showed normal orientation, mood, affect, memory, thought process and attention span, as well as appropriate knowledge base.  (R. at 371, 413.)

Plaintiff experienced multiple fifteen-second seizures in late September 2014 after which he felt confusion, generalized weakness, difficulty finding words, lightheadedness and nausea.  (R. at 400.)  Plaintiff explained that he had recently missed a dose of his anticonvulsant medication, because he had refused to fill it.  (R. at 399.)  Four days after experiencing these

---

[8]    An electroencephalogram uses electrodes to measure electrical currents in the brain, recording those currents as waves.  *Electroencephalogram*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[9]    Lateralization denotes the localization of function or activity on one side of the body.  *Lateralization*, Merriam-Webster, https://www.merriam-webster.com/dictionary/lateralization.

[10]    Epileptiform features are those that resemble epilepsy or its manifestations.  *Epilepsy*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

seizures, Plaintiff visited the emergency room, because he experienced lingering feelings of confusion. (R. at 398-99.) However, Plaintiff did not lose consciousness or his capacity for generalized motor activity, nor did he experience incontinence, apnea or numbness after the seizures. (R. at 399.) Further, as the ALJ noted, Plaintiff demonstrated normal speech, mood and affect, he appeared alert, oriented and not in any acute distress, and he showed no motor or sensory deficits during his emergency room visit. (R. at 18, 401-02.) When Plaintiff left the emergency room, he appeared in good condition. (R. at 408.)

Plaintiff returned to Rappahannock Neurology Specialists for a follow-up appointment with Dr. Christopher Kobet, M.D., on November 17, 2014. (R. at 411.) Plaintiff reported that he had experienced a seizure two or three days before his appointment, but he denied experiencing seizures during October 2014. (R. at 411.) Plaintiff appeared well-nourished and oriented. (R. at 412.) He demonstrated normal memory, thought process, attention span and vocabulary, with appropriate knowledge of current events and history. (R. at 413.) He could name objects, repeat phrases and speak spontaneously. (R. at 413.) Dr. Kobet diagnosed Plaintiff with transient alterations of awareness and panic anxiety syndrome, deciding that Plaintiff's episodes more closely resembled panic attacks than seizures. (R. at 413.) Accordingly, Dr. Kobet took Plaintiff off of Lamotrigine and prescribed Prozac for him instead. (R. at 413.)

On January 16, 2015, Plaintiff informed his neurologist, Richard Erwin, M.D., that he did not like how Prozac made him feel, adding that he had experienced several seizure-like episodes, so he began taking Lamotrigine again. (R. at 420.) Dr. Erwin noted that, although Plaintiff experienced fatigue and insomnia, he had only occasional short-term memory problems, and he described Plaintiff as awake, alert, attentive, oriented and in no acute distress. (R. at 420.) Dr. Erwin recommended that Plaintiff undergo a 48-hour EEG, which revealed one abnormality: "a

brief, seconds[-]only, paroxysm[11] of high amplitude bifrontally maximum high[-]amplitude delta activity." (R. at 422.)  Notably, the EEG showed no epileptic activity.  (R. at 420.)

Plaintiff returned to Dr. Erwin on February 18, 2015, reporting that he had not experienced any episodes after the January 2015 appointment.  (R. at 417.)  In fact, Dr. Erwin remarked that Plaintiff did not seem "overly anxious about anything" and "certainly [did not] appear depressed."  (R. at 417.)  Dr. Erwin, highlighting the infrequency of Plaintiff's spells and lack of a clear diagnosis, did not prescribe any medication for Plaintiff and instead recommended a wait-and-see approach.  (R. at 417.)  Plaintiff treated with Dr. Erwin again on April 20, 2015, reporting that he experienced three or four spells on March 5, 2015, after which he "felt fearful[ and] paranoid for seven to ten days."  (R. at 426.)  Dr. Erwin prescribed Depakote for Plaintiff and ordered laboratory tests.  (R. at 426.)

On June 5, 2015, Plaintiff presented to the National Spine and Pain Centers, complaining of pain throughout his body.  (R. at 473.)  During the appointment, Plaintiff denied depression and anxiety, and he appeared well-developed, well-nourished, in no acute distress, alert and cooperative, with normal mood, affect, attention span and concentration.  (R. at 474.)

Plaintiff returned to Dr. Erwin on June 15, 2015, reporting that he had not experienced any spells since starting Depakote.  (R. at 425.)  Plaintiff appeared awake, alert, pleasant and conversant.  (R. at 425.)  Plaintiff's neurologic exam yielded normal results, as did the laboratory tests that Dr. Erwin ordered during Plaintiff's previous visit.  (R. at 425-26.)  Dr. Erwin remarked that Depakote seemed to be "working on the psychiatric end of things" to stabilize Plaintiff's mood.  (R. at 425.)

---

[11]     A paroxysm is a sudden recurrence or intensification, or alternatively, a spasm or a seizure.  *Paroxysm*, Dorland's Illustrated Medical Dictionary, (32 ed. 2012).

Plaintiff visited Dr. Erwin again on November 12, 2015. (R. at 445-46.) Dr. Erwin noted that Plaintiff felt well, "tolerat[ed the Depakote] quite nicely" and had not experienced any mood changes, tremors, sedation or seizure-like episodes since starting the medication. (R. at 445.) Plaintiff's last round of blood work again returned normal results, indicating that the Depakote had not caused Plaintiff's short-term memory problems. (R. at 445.) Dr. Erwin recommended a 24-hour EEG and cognitive testing, ordered tests on Plaintiff's thyroid-stimulating hormone ("TSH")[12] and B12 levels, and continued Plaintiff's Depakote prescription. (R. at 446.) The TSH and B12 test results fell within normal ranges. (R. at 455 (Mary Washington Hospital Medical Laboratories report from December 14, 2015).) Further, during Plaintiff's EEG on December 7 and 8, 2015, he did not experience any spells. (R. at 457.) And the EEG yielded "normal" results. (R. at 457.)

Plaintiff underwent a mental status examination on December 14, 2015. (R. at 456.) Plaintiff scored seventy-two out of one-hundred points, placing him within the normal range for his age group (seventy-one to ninety-one points), albeit on the lower end. (R. at 436.) However, he scored ten out of twenty-nine points on the short-term memory subset, a score that qualified as "poor." (R. at 436.)

Plaintiff returned to Dr. Erwin on December 18, 2015, commenting that on days when he had nothing to do, he would lay around. (R. at 443.) Dr. Erwin noted that Plaintiff continued to "tolerat[e] the Depakote quite nicely," and despite experiencing amotivation and fatigue, Plaintiff did not report any mood changes, tremors, sedation or seizure-like spells. (R. at 443.)

---

[12]   Thyroid stimulating hormone, or thyrotropin, is a pituitary hormone that promotes the growth of, sustains and stimulates the hormonal secretion of the thyroid gland. *Thyrotropin*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

Further, Plaintiff appeared grossly normal, in good spirits, pleasant and conversant. (R. at 444.)
Dr. Erwin diagnosed Plaintiff with "primary generalized nonconvulsive seizures, absence onset
epilepsy" and continued Plaintiff's Depakote prescription. (R. at 444.)

On April 27, 2016, Plaintiff underwent a depression and quality of life screening at the
Lloyd F. Moss Free Clinic. (R. at 438.) The screening suggested that Plaintiff suffered from
moderate depression and moderate anxiety. (R. at 438.)

Plaintiff's last two recorded visits with Dr. Erwin took place on July 18, 2016, (R. at
441), and November 10, 2016, (R. at 439). During both appointments, Plaintiff appeared awake,
alert, pleasant and conversant. (R. at 440, 442.) Dr. Erwin commented that Plaintiff continued to
respond well to Depakote, and that Plaintiff had not experienced any seizures since starting the
medication. (R. at 439, 441-42.) During the November 2016 appointment, Plaintiff mentioned
that three weeks earlier he had begun taking a low dosage of Cymbalta to treat his depression,
adding that he had yet to experience any "major benefit" from the medication. (R. at 439.) Dr.
Erwin recommended that Plaintiff continue to take Cymbalta, reducing the dosage if the drug
caused Plaintiff any sexual dysfunction. [13] (R. at 440.)

Lastly, on July 10, 2017, Plaintiff presented to Dr. May for a psychological evaluation
and mental status examination. (R. at 483-84.) Dr. May noted that, despite seeming depressed,

---

[13]     In Plaintiff's challenge to the weight that the ALJ assigned to Dr. Handley, Plaintiff
argues that the ALJ failed to mention Dr. Erwin's observations about Plaintiff's depression and
lack of motivation. (Pl.'s Mem. at 12.) Although the ALJ did not explicitly discuss Dr. Erwin
by name in her opinion, she did cite to Dr. Erwin's treatment notes throughout her explanation of
her RFC assessment. (R. at 17.) In fact, the ALJ acknowledged that Plaintiff's memory-related
subtest score on the mental status examination that Dr. Erwin administered fell below the normal
range, and that Dr. Erwin "suspected [Plaintiff's] memory impairments to be a manifestation of
his mild depression." (R. at 17.) Ultimately, "[t]he Commissioner, through the ALJ and Appeals
Council, stated that the whole record was considered, and, absent evidence to the contrary, we
take [him] at [his] word." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (citing
*Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005)).

worried and grim, Plaintiff appeared alert and demonstrated normal, clear and articulate speech, logical and goal-directed thought processes, and intact attention, concentration, long-term memory and fund of information. (R. at 484.)

Overall, the objective medical evidence in the record supports the ALJ's decision to afford significant, but not great, weight to Dr. Handley's opinion. As the ALJ noted, Plaintiff's mental limitations did not appear as severe as Dr. Handley endorsed. (R. at 18.) For example, Plaintiff often appeared unstressed and calm during doctors' visits. (R. at 373 (denying stress in March 2014), 417 (remarking that Plaintiff did not appear "overly anxious about anything" in February 2015), 474 (denying anxiety in June 2015).) And, although Dr. Sangha and Dr. Kobet both remarked that Plaintiff's seizure-like episodes could stem from panic anxiety syndrome, (R. at 372, 374, 413, 421), these episodes stopped when Plaintiff started taking Depakote, (R. at 425-26, 439, 441-43, 445).

Likewise, although Plaintiff's medical providers commented on Plaintiff's depressive symptoms, which the ALJ acknowledged, (R. at 17; *see, e.g.*, R. at 440-41 (attributing Plaintiff's short-term memory problems and lack of motivation to his depression)), Plaintiff denied depression during a visit to the National Spine and Pain Centers in June 2015, (R. at 474), and Dr. Erwin remarked that Plaintiff did not appear depressed during a February 2015 visit, (R. at 417). Indeed, treatment notes from Plaintiff's other medical providers indicate that Plaintiff consistently appeared alert, oriented, and in no acute distress. (R. at 347, 349, 384, 401, 421, 425, 440, 442, 463-64, 474, 482, 484.)

Further, in contrast to Dr. Handley's statement that Plaintiff's depression worsened his mood, Plaintiff's mood and affect often appeared normal and stable. (R. at 371 (normal mood in June 2014), 402 (normal mood in September 2014), 425 (Dr. Erwin commented that Depakote

stabilized Plaintiff's mood in June 2015), 443 (no mood changes in December 2015), 445 (same in November 2015), 475 (normal mood in June 2015). *But see* 485 (depressed mood in July 2017).) Dr. Handley also indicated that Plaintiff's fear of oral ingestion had prevented him from taking an extended course of medication; yet, Plaintiff took Depakote orally to control his seizure condition from April 2015 until his hearing on May 23, 2017.  (R. at 62, 426.)  These inconsistencies support the ALJ's assignment of less-than-controlling weight to Dr. Handley's opinion.  (R. at 18.)

Moreover, as the ALJ noted, Plaintiff's testimony suggested that his limitations did not rise to the level of severity that Dr. Handley endorsed.  (R. at 18.)  Plaintiff testified that he did not help with housework or yardwork, clean dishes or make the bed, and he largely avoided going to the store.  (R. at 51-52, 56.)  However, Plaintiff admitted that he took out the trash out once per week, helped with laundry a couple times per week, went outside daily, drove to appointments with Dr. Handley once every two weeks, communicated with friends over phone and email, and talked to his girlfriend.  (R. at 51-54.)  He also read, went on the internet, played guitar and painted daily.  (R. at 51-54.)  Plaintiff's mother, Maryann Bush Kane, similarly testified that Plaintiff cleaned a little at home, painted, played guitar, took photographs in the yard and sometimes went to Target with his girlfriend.  (R. at 62-63.)

Plaintiff argues that, in discounting Dr. Handley's opinion, the ALJ mischaracterized Plaintiff's testimony and improperly relied on Plaintiff's activities of daily living to establish that Plaintiff could work.  (Pl.'s Mem. at 10-12.)[14]  But the ALJ did not rely solely on Plaintiff's

---

[14]     Defendant interprets Plaintiff's argument regarding the ALJ's characterization of his activities of daily living as challenging the ALJ's credibility assessment, (Def.'s Mem. at 21-22), but Plaintiff's argument clearly goes to the reasons why the ALJ afforded Dr. Handley's opinion significant, but not great, weight, (Pl.'s Mem. at 10-12).  Because the Court finds that the ALJ's

activities of daily living in addressing Dr. Handley's opinion. Rather, the ALJ cited to Plaintiff's activities as one category of evidence, among others, that justified the weight assigned. (R. at 17.) Neither did the ALJ consider the types of activities that Plaintiff could perform without considering the extent to which Plaintiff could perform them. *See Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (requiring remand where the ALJ failed to consider extent to which Plaintiff could perform daily activities). Plaintiff points to technical differences between the ALJ's characterization of Plaintiff's daily activities and Plaintiff's testimony regarding those activities, (Pl.'s Mem. at 10-12), but such minor discrepancies fail to temper the Court's analysis, because the ALJ clearly considered the extent to which Plaintiff could perform his daily activities and appropriately relied on those activities in discounting Dr. Handley's opinion. (*See* R. at 18 (noting that Plaintiff "help[ed] with laundry *twice weekly*, [took] out the trash *once weekly*, [went] outside *daily* . . . and engag[ed] in hobbies *daily*." (emphasis added).)

In sum, Plaintiff's ability to perform a variety of daily tasks, coupled with the objective medical evidence, supports the ALJ's decision to afford Dr. Handley's opinion less-than-controlling weight.

### 2. *Dr. May's Opinion*

On July 10, 2017, Plaintiff presented to Dr. May for a psychological evaluation and a mental status examination. (R. at 483-87.) Dr. May described Plaintiff as alert, oriented and pale, noting that he had normal, clear and articulate speech, as well as logical and goal-directed thought processes, but he displayed a depressed, grim and worried affect. (R. at 484.) Plaintiff demonstrated "significant" OCD symptoms like "irrational fears about germs and contamination,

---

opinion requires remand on other grounds, the Court finds it unnecessary to assess whether the ALJ erred in assessing Plaintiff's credibility.

compulsive cleaning, handwashing and excessive worry." (R. at 484.)  Plaintiff described his

mood as "anxious" and reported that he slept between five and ten hours at night.  (R. at 484.)

Plaintiff stated that he had a "very poor appetite" and moderate chronic anxiety without panic

attacks, and he rated his depression as a seven out of ten.  (R. at 484.)  Plaintiff had intact

attention, concentration, long-term memory and fund of information.  (R. at 484.)  He could

repeat five digits forward and three digits backward, spell "world" backward, state who wrote

*Hamlet* and the location of Brazil, and he could identify Martin Luther King, Jr.  (R. at 484.)  Dr.

May opined that Plaintiff's judgment by history appeared limited, but found that his judgment by

testing appeared intact.  (R. at 484.)  And Dr. May recorded that Plaintiff's worrying, anxiety and

depression seemed to distort his reality and markedly impaired his social functioning.  (R. at

484.)

Dr. May observed that Plaintiff appeared casually dressed and groomed, but that he

seemed to neglect his hygiene.  (R. at 484-85.)  Plaintiff's facial expressions and movement

appeared "very limited," and he did not make eye contact.  (R. at 484.)  Plaintiff reported that he

did not have many friends, but he hoped that he got along well with others.  (R. at 484.)  He also

reported showering every two to three days.  (R. at 484.)  Dr. May described Plaintiff as

depressed, immobilized and indecisive, with poor persistence and motivation.  (R. at 484.)

Dr. May diagnosed Plaintiff with OCD, major recurrent depression, ARFID and avoidant

personality traits.  (R. at 485.)  She wrote that Plaintiff demonstrated symptoms of severe

anxiety, irrational fears of germs and contamination, compulsive behaviors, marked deficits in

his ability to eat due to chronic food revulsion and gaining responses.  (R. at 485.)  She noted

that Plaintiff appeared chronically depressed, and he displayed an inability to feel pleasure,

amotivation, depressed mood and sleep disturbance.  (R. at 485.)  Dr. May also opined that

Plaintiff's anxiety caused significant avoidance patterns, noting that Plaintiff rarely left his house and interacted only with family members. (R. at 485.) She opined that Plaintiff could understand simple, repetitive tasks, but his significant depressive symptoms (i.e., amotivation, isolation and withdrawal) and significant OCD symptoms (i.e., chronic anxiety, intrusive thoughts and compulsive cleaning and handwashing) mildly to moderately impaired his ability to perform such tasks. (R. at 485.) Dr. May also opined that Plaintiff could accept instructions from supervisors and could likely perform many tasks without special supervision, but Plaintiff's severe anxiety, isolation and withdrawal impaired his ability to interact with supervisors, co-workers and the public. (R. at 485.) She further assessed that Plaintiff would likely decompensate under the stressors of competitive work. (R. at 485.)

The ALJ assigned significant — but not great — weight to Dr. May's opinion, citing to inconsistencies between her opinion and the record. (R. at 19.) The ALJ explained that the Plaintiff's description of his activities to Dr. May (having no hobbies and doing "nothing" on a daily basis), which Dr. May relied upon to shape her opinion, varied significantly from Plaintiff's description of his activities during his hearing. (R. at 19.) The ALJ further noted that Dr. May's opinion did not comport with treatment records showing no significant psychological abnormalities. (R. at 19.) The Court finds that the ALJ provided a legally sufficient explanation for the weight assigned to Dr. May's opinion and that substantial evidence supports the weight assigned.

Indeed, during his visits to healthcare providers, Plaintiff generally appeared alert, oriented, conversant, pleasant, in no acute distress and not anxious. (R. at 347, 349, 384, 401, 421, 425, 444, 463-65, 474, 482.) Further, Plaintiff often did not appear anxious during appointments. (R. at 373, 384, 417, 474.) Plaintiff's anxiety-induced, seizure-like episodes

stopped when Plaintiff began taking Depakote. (R. at 425-26, 439, 441-43, 445.)  And, Plaintiff's depression did not seem abnormally severe. (R. at 417, 440-44, 474.)  Moreover, Plaintiff's mood and affect consistently appeared normal and stable, despite his depression. (R. at 371, 402, 425, 443, 445, 474. *But see* R. at 485 (depressed mood in July 2017).)

Further, Plaintiff's testimony supports the ALJ's finding that Dr. May's descriptions of Plaintiff's activities of daily living significantly differed from those that Plaintiff described in his testimony. (R. at 19.)  During the evaluation, Plaintiff told Dr. May that Plaintiff had no hobbies and did "nothing" during the evenings. (R. at 484.)  However, Plaintiff testified during his hearing that he helped with some housework, communicated with friends, spoke to his girlfriend and had daily hobbies. (R. at 51-56.)   Plaintiff's mother similarly testified that Plaintiff cleaned a little at home, had hobbies and occasionally went to the store with his girlfriend. (R. at 62-63.) This testimony demonstrates that Plaintiff retained greater functional capacity than he expressed during Dr. May's evaluation and supports the ALJ's decision to discount Dr. May's opinion, because she formulated her opinion without a full understanding of Plaintiff's daily activities. (R. at 19.)

Because the ALJ provided a legally sufficient explanation for the weight assigned to Dr. May's opinion, and because substantial evidence supports the ALJ's conclusion, the ALJ did not err.

### B.     The Hypothetical Posed to the VE Adequately Accounted for Plaintiff's Marked Limitation in Social Functioning.

Plaintiff argues that the ALJ's RFC assessment, which limited Plaintiff to "no interaction with the public and no more than occasional interaction with co-workers and supervisors," did not properly account for Plaintiff's marked limitation in interacting with others. (Pl.'s Mem. at 7-9, 13.)  Specifically, Plaintiff asserts that the ALJ should not have distinguished between

22

Plaintiff's ability to interact with co-workers and supervisors and his ability to interact with the general public.  (Pl.'s Mem. at 7.)  Plaintiff further argues that the ALJ failed to address Plaintiff's ability to interact with others "independently, appropriately, effectively and on sustained basis."  (Pl.'s Mem. at 7.)  Defendant responds that the ALJ properly accounted for Plaintiff's marked limitation in social functioning in the RFC, and that substantial evidence supports the ALJ's decision.  (Def.'s Mem. at 17-18.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC.  20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1).  In analyzing a claimant's abilities, the ALJ must first assess the nature and extent of the claimant's physical limitations and then determine the claimant's RFC for work activity on a regular and continuing basis.  § 404.1545(b).  Generally, the claimant is responsible for providing the evidence that the ALJ utilizes in making her RFC determination; however, before determining that a claimant is not disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary.  § 404.1545(a)(3).  The RFC must incorporate impairments supported by the objective medical evidence in the record, as well as those impairments that are based on the claimant's credible complaints.  *Carter v. Astrue*, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011); *accord* § 404.1545(e).

Social Security Ruling 96-8p instructs that the RFC "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations."  *Mascio*, 780 F.3d at 636 (citing SSR 96-8p).  The Ruling further explains that the RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific

medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." *Id.* (citing SSR 96-8p).

With respect to Plaintiff's social functioning, at step three, the ALJ found that Plaintiff had marked limitations in interacting with others. (R. at 14.) In assessing Plaintiff's RFC, the ALJ limited Plaintiff to no interaction with the public and no more than occasional interaction with co-workers and supervisors. (R. at 15.) In support of these limitations, the ALJ noted that the Plaintiff had a limited social life and avoided going out in public and touching things because of his OCD-related fear of contamination. (R. at 14, 16.) The ALJ also recognized that Plaintiff spoke to his girlfriend, occasionally went to the store and communicated with friends over phone and email. (R. at 16.)

Plaintiff argues that the ALJ erred by distinguishing between Plaintiff's ability to interact with co-workers and supervisors and his ability to interact with the general public. (Pl.'s Mem. at 7-9.) Specifically, Plaintiff contends that, because the listing of mental impairments makes no distinction between the ability to interact with co-workers and supervisors and the ability to interact with the public, the ALJ should not have made such a distinction in her RFC assessment. (Pl.'s Mem. at 8; *see also* 20 C.F.R. § 404, Subpart P, Appendix 1, Part A, § 12.00(E)(2) ("This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public.").) This argument fails, however, because ALJs commonly make this distinction in RFC assessments when a claimant demonstrates the ability to interact with others at his workplace but not with the public. *See, e.g.*, *Holmes v. Berryhill*, 2018 WL 3421598, at *1, *3 (E.D. Va. June 6, 2018) (finding that substantial evidence supported RFC assessment that limited the plaintiff to no interaction with the public and no more than occasional interaction with co-workers and supervisors when the plaintiff suffered from OCD, depression and post-

24

traumatic stress disorder, but could manage her conditions, had unremarkable mental status examinations and displayed good social skills), *report and recommendation adopted*, 2018 WL 3420798 (E.D. Va. July 13, 2018).

Similarly, here, the record demonstrates that, despite Plaintiff's "limited social life" and avoidance of public places like restaurants and malls, he retained the ability to tolerate at least some social interaction. (R. at 14, 16.)  Indeed, Plaintiff's medical providers consistently described him as pleasant, conversant and cooperative. (R. at 334, 417, 420, 425-26, 439, 442-43, 445, 463-64, 475.)  Further, medical providers typically described Plaintiff's affect as normal and his mood as normal or stable. (R. at 371, 402, 425, 443, 463-64, 475, 482.)  Plaintiff also consistently demonstrated normal speech. (R. at 402, 463-64, 482, 484.)  And medical providers repeatedly observed that Plaintiff's social and psychological functioning appeared normal. (R. at 371, 402, 412-413, 425, 440, 442-43, 456, 463-64, 474, 484. *But see* R. at 441 (noting amotivation resulting from depression).)

The ALJ's treatment of the opinion evidence likewise supports the ALJ's finding that Plaintiff could tolerate occasional interaction with supervisors and co-workers, but no interaction with the general public.  Dr. Handley opined that Plaintiff's would require "excessive accommodations" at work and would find it nearly impossible to interact with both co-workers and the public due to his OCD- and ARFID-related symptoms. (R. at 482.)  Yet, Dr. Handley also noted that Plaintiff had goal-oriented and coherent speech with a normal rhythm, rate and volume, made appropriate eye contact, had good social skills and dressed appropriately. (R. at 482.)  As explained above, the ALJ afforded Dr. Handley's opinion significant, but not great, weight, because Plaintiff testified that he could perform a greater range of daily activities than noted by Dr. Handley, and because the limitations opined by Dr. Handley did not comport with

the lack of treating source observations regarding Plaintiff's mental status and medical records reflecting that Plaintiff frequently displayed a normal mood and affect. (R. at 18.)

Dr. May likewise opined that Plaintiff's severe anxiety, isolation and withdrawal impaired his ability to interact with supervisors, co-workers and the public. (R. at 485.) Unlike Dr. Handley, Dr. May also found that Plaintiff could accept instructions from supervisors and could perform many tasks without special supervision, despite the impact of his mental impairments on his ability to interact with others. (R. at 485.) Moreover, although Plaintiff exhibited significant OCD symptoms and irrational fears, displayed an anxious mood and depressed affect, appeared grim and worried, and did not make eye contact, Plaintiff cooperated with Dr. May and demonstrated a pleasant attitude. (R. at 485-86.) The ALJ afforded Dr. May's opinion significant, but not great, weight, because Plaintiff's testimony, as well as the lack of psychological abnormalities discussed in Plaintiff's treatment records, did not comport with the degree of impairment that Dr. May endorsed. (R. at 19.)

Lastly, Plaintiff testified to engaging in a variety of daily activities that support the social limitations assessed by the ALJ. (R. at 50-56.) As the ALJ noted, Plaintiff testified that he had a girlfriend, communicated with friends via phone or email, went to the store occasionally, drove to doctors' appointments every two weeks and maintained daily hobbies. (R. at 16, 18, 50-56.)

This testimony, coupled with the opinion evidence and medical records, demonstrates that Plaintiff possessed the ability to engage in at least some social interactions and supports the ALJ's decision to limit Plaintiff to occasional interaction with co-workers and supervisors and no interaction with the public. Although Plaintiff argues that the ALJ failed to address "the quality with which [Plaintiff] would interact once he is engaged; i.e., how 'independently, appropriately, effectively and on a sustained basis' he would respond," (Pl.'s Mem. at 7), Plaintiff does not

identify what additional restrictions the ALJ should have included in the RFC assessment to address Plaintiff's marked limitation in social functioning. And, as the ALJ noted, the absence of objective medical records recording psychological abnormalities does not support the inclusion of additional restrictions. (R. at 18-19.) Accordingly, the ALJ adequately explained how Plaintiff's marked limitations in social functioning at step three translated into the social limitations included in Plaintiff's RFC.

C.    **The ALJ Failed to Define "Non-Production Oriented Work Setting" in Her RFC Assessment, Requiring Remand.**

Plaintiff also challenges the VE's testimony, arguing that the hypothetical posed to the VE included three factors that the DOT does not address, namely:  (1) the requirement of a sit/stand option; (2) production-oriented work settings; and, (3) frequency of contact with the general public, co-workers and supervisors. (Pl.'s Mem. at 13.)  Plaintiff argues that although the VE explained that he based his testimony regarding the sit/stand option and the non-production-oriented limitation on his experience, the VE did not explain his basis for his testimony regarding the limitations addressing Plaintiff's interactions with others. (Pl.'s Mem. at 13.)  Defendant responds that the VE's testimony did not conflict with the DOT. (Def.'s Mem. at 22-27.)  The Court agrees with Defendant that the VE's testimony did not conflict with the DOT with respect to the sit/stand option and the social interaction limitations; however, the ALJ erred when she included a production-related limitation without adequately defining that term, requiring remand.

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant could perform other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 404.1566. The Commissioner can carry her burden in the final step with the testimony of a VE.

27

§ 404.1566(e).  During an administrative hearing, the ALJ must pose hypothetical questions to

the VE that accurately represent the claimant's RFC, so that the VE can offer testimony about

any jobs existing in the national economy that the claimant could perform.  *Walker v. Bowen*,

889 F.2d 47, 50 (4th Cir. 1989).

In *Pearson v. Colvin*, the Fourth Circuit explained the responsibilities of the ALJ

regarding the VE testimony.  810 F.3d 204, 208-10 (4th Cir. 2015).  First, the ALJ must ask the

VE whether his testimony conflicts with the DOT.  *Id.* at 208; SSR 00-4p at 4.  Second, and

independent of the first step, the ALJ must obtain an explanation of apparent conflicts.  *Pearson*,

810 F.3d at 208-09; SSR 00-4p at 4.  Indeed, the ALJ need not address any and every conflict,

nor can she address only obvious ones.  *Pearson*, 810 F.3d at 209.  Instead, the Fourth Circuit

interprets apparent conflicts as those in which the VE's testimony "seems to, but does not

necessarily, conflict with the [DOT]."  *Id.*  For example, an apparent conflict exists when an ALJ

limits a claimant to only occasional overhead reaching, and the DOT lists frequent reaching as a

requirement for all of the jobs identified by the VE.  *Id.* at 210.

Here, the ALJ did not ask the VE whether his testimony conflicted with the language in

the DOT, but the VE explained that it did not.  (R. at 70.)  Specifically, the VE stated that the

jobs that he suggested —

> [a]re representative examples of light work of light work all with SVP's of 2 that are
> consistent with the descriptions provided in the [DOT] with the exception of the sit, stand
> limitation and the non-productivity type of work neither of which are specifically
> addressed or discussed in the Dictionary of Occupational Titles.  In that regard I'm
> basing my comments on my knowledge, my understanding and 25 years of experience in
> the field of vocational rehabilitation otherwise consistent with the DOT.

(R. at 70.)  The VE testified that an individual of Plaintiff's age, education, work experience and

RFC could work as a non-postal mail clerk (DOT No. 209.687-026), a general office helper

(DOT No. 239.567-010) or a router (DOT No. 222.587-038).  (R. at 70.)  In her opinion, the ALJ

concluded that the VE's testimony aligned with the DOT, and that the VE's explanation regarding the sit/stand option and production-oriented work settings resolved any possible conflicts. (R. at 20.)

### 1. *The Sit/Stand Limitation Did Not Conflict With the DOT.*

The Court finds that no apparent conflict existed between the DOT and the ALJ's requirement of a sit/stand option. Courts within the Fourth Circuit have consistently declined to find a conflict between a sit/stand option and the DOT. *See, e.g.*, *Baxley v. Berryhill*, 2018 WL 5817377, at *16 (M.D.N.C. Nov. 6, 2018) (holding that no conflict existed between the VE's testimony and the DOT, because the DOT is silent as to the sit/stand option); *Williams v. Colvin*, 2016 WL 1276415, at *19-20 (E.D.N.C. Mar. 30, 2016) (same); *see also Walls v. Barnhart*, 296 F.3d 287, 290-91 (4th Cir. 2002) (recognizing existence of light-work jobs with sit/stand options); *Collins v. Berryhill*, 2018 WL 4232888, at *25 (E.D. Va. Aug. 17, 2018) (holding that a sit/stand option does not invalidate a hypothetical posed to a VE), *report and recommendation adopted*, 2018 WL 4224854 (E.D. Va. Sept. 5, 2018)).

Even if an apparent conflict existed between the DOT and the VE's testimony, the ALJ adequately resolved it, because the VE affirmatively stated that he based his comments about the sit/stand option on his "knowledge, . . . understanding and 25 years of experience in the field of vocational rehabilitation otherwise consistent with the DOT." (R. at 70.) This explanation resolved any potential apparent conflict. *See Pearson*, 810 F.3d at 11 (citing SSR 00-4p) (holding that the ALJ must independently obtain a reasonable explanation for a potential conflict between the DOT and the VE's testimony to resolve an apparent conflict); *Baxley*, 2018 WL 5817377 at *17 (holding that a VE's explanation that she relied on her "education, training, and professional experience" to support her endorsement of a sit/stand option adequately resolved

any conflict between the DOT and the VE's testimony).  Accordingly, the ALJ did not err by relying on the VE's testimony to the extent that it addressed Plaintiff's need for a sit/stand option.

>    2.    *The Social Interaction Limitations Did Not Conflict With the DOT.*

Neither does a conflict exist between the social interaction limitations included in the RFC and the DOT.  Here, the VE testified that Plaintiff could perform the unskilled, light-work occupations of mail clerk (DOT 209.687-026), general office helper (DOT 239.567-010), and router (DOT 222.587.-038).  (R. at 70.)  The ALJ adopted these suggested occupations in finding that Plaintiff did not qualify as disabled under the Act.  (R. at 20.)

The DOT ranks the degree of interaction with people in each job type on the following scale:

    0. Mentoring
    1. Negotiating
    2. Instructing
    3. Supervising
    4. Diverting
    5. Persuading
    6. Speaking-signaling
    7. Serving
    8. Taking Instructions-Helping

DOT, App. B.  The DOT explains that, at most, routers and mail clerks are expected to perform at level eight, "Taking Instructions-Helping," which constitutes the lowest possible function concerning relationships with others.  DOT 209.687-026; DOT 222.587.  General office helpers can expect to perform the lowest three functions:  speaking-signaling (level six), serving (level seven) and taking instructions-helping (level eight).  For all three jobs, the DOT characterizes relationships with other people as a "not significant" aspect of the job.  (DOT 209.687-026; DOT 222.587; DOT 239.567-010).  The DOT also notes that routers and mail clerks are never

expected to use the skill of "talking," (DOT 209.687-026; DOT 222.587), and that general office helpers may talk occasionally, meaning up to one-third of their time at work, (DOT 239.567-010).

Jobs that rank the interaction-with-others function as "not significant" adequately account for limitations on a claimant's ability to interact with the public, co-workers and supervisors. *See, e.g.*, *Praylow v. Colvin*, 2016 WL 11200706, at *35-36 (D.S.C. Sept. 7, 2016) (holding that jobs requiring only "taking instructions-helping" at a not-significant level accounted for the plaintiff's limitation to no interaction with the public); *Wiles v. Colvin*, 2015 WL 9684908, at *21-22 (D.S.C. Aug. 31, 2015) (finding that office helper job appropriately accounted for limitations on contact with co-workers and the public, because the DOT description listed interaction with people as "not significant"), *report and recommendation adopted*, 2016 WL 109889 (D.S.C. Jan. 8, 2016); *Arsenault v. Astrue*, 2009 WL 982225, at *3 (D. Me. Apr. 12, 2009) (holding that when a job requires "taking instructions-helping" at a not-significant level, the job accounts for individuals limited to only insignificant or occasional interaction with the public and/or co-workers and supervisors). Additionally, unskilled jobs, such as router, mail clerk and officer helper, "ordinarily involve dealing primarily with objects, rather than with data or people," further accounting for the social interaction limitations in Plaintiff's RFC. SSR 85-15. Accordingly, no apparent conflict existed that the ALJ did not adequately address.

### 3. *The ALJ's Lack of Explanation Regarding the Term "Non-Production Oriented Work Setting" Requires Remand.*

The Court finds that the ALJ erred both at step five and in formulating the RFC by failing to adequately explain or define what she meant by the "non-production oriented work setting" limitation included in Plaintiff's RFC and the corresponding hypothetical posed to the VE. This error proves distinguishable from the one that Plaintiff argues, because the Court does not find

issue with any apparent conflict between the DOT and the ALJ's production-related limitation. (Pl.'s Mem. at 13.)  Rather, the Court finds that the ALJ erred by failing to explain what she meant in limiting Plaintiff to "non-production oriented work settings."  Defendant contends that the ALJ's inadequate explanation of this production-related limitation should not require remand, because Plaintiff did not directly raise this argument in his brief. (Def.'s Mem. at 27.)  But the Court must review the entire record and cannot turn a blind eye to an error that prevents it from meaningfully reviewing the ALJ's opinion.  The Court likewise declines Defendant's request for supplemental briefing on this issue, (Def.'s Mem. at 27), because the caselaw clearly states that an ALJ's failure to adequately explain the meaning of "non-production oriented work setting" requires remand.

The term "production rate pace" appears in the DOT, but the DOT does not define this term.  DOT, App. C.  A conflict between the DOT and a VE's testimony does not arise simply because the ALJ includes in the hypothetical posed to the VE a limitation not present in the DOT.  *Corvin v. Berryhill*, 2018 WL 3738226, at *6 (W.D.N.C. Aug. 7, 2018); *Baxley*, 2018 WL 5817377 at *16 (citing *Manley v. Colvin*, 2016 WL 7191541, at *8-9 (C.D. Cal. Dec. 16, 2016)).  Although the ALJ did not explicitly ask the VE whether his testimony conflicted with the DOT, the VE explained that he based his comments about the non-production oriented work limitation on his knowledge, understanding and experience. (R. at 70.)  Thus, the ALJ did not commit reversible error when she failed to independently elicit an explanation of any apparent conflict between the VE's testimony regarding this limitation and the DOT.

However, in the hypothetical that the ALJ posed to the VE, the ALJ failed to explain the term "non-production oriented work setting," nor did she explain this term when she discussed Plaintiff's RFC in her opinion. (R. at 15-19, 69.)  Although the phrase "production rate pace"

32

appears in a DOT appendix, neither the DOT, regulations, nor caselaw define the term, and the term "non-production rate pace" is not self-explanatory. *Thomas v. Berryhill*, 916 F.3d 307, 312-13 (4th Cir. 2019). Without a sufficient explanation as to what this limitation requires, the Court cannot "meaningfully review" whether the ALJ crafted an RFC that adequately accounted for all of Plaintiff's limitations. *Id.* at 312 n.5. Thus, the ALJ's failure to explain the production-rate limitations included in the RFC requires remand. *Id.* at 312-13.

In *Thomas*, the Fourth Circuit held that the ALJ erred when she restricted the plaintiff to work that did not require a "production rate" or "demand pace." *Id.* at 312-13. The ALJ included other restrictions that accounted for the plaintiff's mental and social limitations, such as limiting the plaintiff to work involving short, simple instructions, routine tasks, occasional public interaction, frequent but not continuous interaction with co-workers and supervisors, and work that did not involve crises, complex decision-making and variations in routine. *Id.* at 310. Despite the inclusion of these limitations, the court still held that the ALJ did not adequately explain the meaning of the production-rate and demand-pace limitations. *Id.* at 312-13; *see also Perry v. Berryhill*, 765 F. App'x 869, 871 (4th Cir. 2018) (holding that the ALJ erred when she failed to define the non-production-oriented limitation included in the plaintiff's RFC, because her lack of explanation left the court "uncertain as to what the ALJ intended" and unable to "meaningfully assess whether there was a 'logical bridge' between the evidence in the record and the ALJ's conclusion" (citations omitted)).

An ALJ can provide sufficient context for a production-related limitation in the RFC assessment by including additional descriptors that adequately contextualize the limitation. In *Sizemore v. Berryhill*, for instance, the Fourth Circuit found that an ALJ adequately explained an RFC assessment that limited the plaintiff to work in a "low stress [setting] defined as non-

production jobs [without any] fast-paced work [and] no public contact." 878 F.3d 72, 79 (4th Cir. 2017) (alterations in original).  The court held that the descriptors "low stress," "without any fast-paced work," and "no public contact" provided context for the plaintiff's limitation to non-production-oriented jobs and ensured that the limitation properly accounted for the plaintiff's moderate limitation in concentration, persistence and pace. *Id.* at 80-81.  District courts have accordingly found that limitations describing the pace or rate at which a claimant would be expected to work sufficiently clarify a production-related limitation. *See Ross v. Berryhill*, 2019 WL 955158, at *2-3, *18-20 (M.D.N.C.. Feb. 27, 2019) (upholding RFC determination that limited the plaintiff to a low-stress and low-production environment with no rigid quota involving simple, routine and repetitive tasks and only occasional exposure to people), *report and recommendation adopted*, 2019 WL 1430129 (M.D.N.C. Mar. 29, 2019).

Here, although the ALJ limited Plaintiff to unskilled work with an SVP of no more than two, no interaction with the public and only occasional interaction with co-workers and supervisors, (R. at 69), she failed to sufficiently explain or contextualize the "non-production oriented work setting" limitation included in the hypothetical and RFC assessment.  First, the limitations on Plaintiff's interactions with others do not indicate the pace or stress level at which Plaintiff would be expected to work.  Second, the terms "work with an SVP of one or two" and "unskilled work" mean "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time," which says little to nothing about Plaintiff's ability to perform work at a certain pace.  § 404.1568; SSR 00-4p.[15]  And, following *Thomas* and *Perry*,

---

[15]    "SVP 'is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Bryant v. Astrue*, 2012 WL 896147, at *32 n.9 (E.D.N.C. Apr. 15, 2011) (quoting DOT, App. C, 1009 (4th ed. 1991)).  "An SVP of 2 equates to 'unskilled work.'" *Id.* (quoting S.S.R. 00-4p, 2000 WL 1898704, at *3).  Unskilled work is work

district courts in this circuit have held that RFC assessments limiting claimants to simple tasks and infrequent interaction with others do not sufficiently contextualize or explain production-related limitations. *See, e.g., Geneva W. v. Comm'r*, 2019 WL 3254533, at *3, *8-9 (D. Md. July 19, 2019) (holding that the ALJ had not sufficiently clarified meaning of non-production-rate limitation, even though the ALJ limited the plaintiff to simple, routine tasks and only occasional contact with the public and co-workers); *Ursula G. v. Comm'r*, 2019 WL 2233978, at *5-10 (D. Md. May 23, 2019) (finding that the ALJ had not adequately explained a non-production-rate limitation despite limiting the plaintiff to simple, routine work with simple instructions that would allow the plaintiff to take three breaks per day).

Plaintiff challenges the ALJ's production-related limitation because the limitation conflicts with the DOT, but he does not directly challenge the inclusion of this limitation in the RFC assessment. (Pl.'s Mem. at 13.) Nevertheless, a deficient RFC assessment necessarily "infect[s] the hypothetical based on that assessment." *Ursula G.*, 2019 WL 2233978 at *6. Because the ALJ did not sufficiently define the production-related limitation included in the hypothetical and RFC, the Court cannot meaningfully assess whether a "logical bridge" exists between the RFC — and the corresponding hypothetical — and the evidence in the record. *Perry*, 765 F. App'x at 371. Accordingly, the Court must vacate and remand the ALJ's decision to provide a "clearer window into her reasoning." *Thomas*, 916 F.3d at 313.[16]

---

"need[ing] little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a).

[16]     Notably, the ALJ found at step three that Plaintiff had moderate limitations in concentration, persistence and pace, (R. at 14), and unskilled work alone does not adequately account for such a limitation, *see Mascio*, 780 F.3d at 638 ("[A]n ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting [the claimant to simple, routine tasks or unskilled work." (internal quotations omitted)). "If [Plaintiff's moderate limitation in concentration, persistence and pace] is addressed at all . . . then it must be through

V.     CONCLUSION

Based on the foregoing analysis, the Court recommends that Plaintiff's Motion for

Summary Judgment (ECF No. 9) be GRANTED, that Defendant's Motion for Summary

Judgment (ECF No. 13) be DENIED, and that the final decision of the Commissioner be

VACATED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g).

Let the Clerk forward a copy of this Report and Recommendation to Senior United States

District Judge Henry E. Hudson and to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and**

**recommendations of the Magistrate Judge contained in the foregoing report within**

**fourteen (14) days after being served with a copy of this report may result in the waiver of**

**any right to a <u>de novo</u> review of the determinations contained in the report and such failure**

**shall bar you from attacking on appeal the findings and conclusions accepted and adopted**

**by the District Judge except upon grounds of plain error.**

                            /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  August 20, 2019

---

the ALJ's reference to a 'non-production oriented work setting.'" *Perry*, 765 F. App'x at 871.
However, without an explanation for this term, the Court cannot decide whether the production-
related limitation appropriately accounted for Plaintiff's limitations, creating a *Mascio* issue. *Id.*